UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PANACEA FINANCIAL,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>TALLIED TECHNOLOGIES, INC.,<br><br>　　　　　Defendant. | Case No. 25-cv-03194-JST<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**<br><br>Re: ECF No. 28 |

Before the Court is Defendant Tallied Technologies, Inc.'s ("Tallied") motion to dismiss. ECF No. 28. The Court will grant the motion in part and deny it in part.

I.  **BACKGROUND**[1]

Plaintiff Panacea Financial ("Panacea") brought this action against Tallied based on allegations that Tallied unlawfully misused confidential information that Panacea shared under a Mutual Non-Disclosure Agreement ("MNDA") to edge Panacea out in the securing of a partnership with the American Dental Association ("ADA").

Panacea is a financial services company started by doctors to provide banking, capital, and financing solutions to medical providers. ECF No. 1 ¶¶ 15–16. As part of its business strategy, Panacea "has developed strong relationships and entered into affinity partnerships with numerous medical trade associations including," in January 2024, with the ADA. *Id.* ¶ 18. "Panacea's partnership with the ADA is memorialized in a January 2024 services agreement that appoints Panacea as the exclusive financial services company to establish and maintain an affinity program for ADA members for various financial services products and services." *Id.* ¶ 19. As a result of

---

[1] For the purpose of resolving the motion to dismiss, the Court accepts as true the allegations in the complaint, ECF No. 1. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

this partnership, "Panacea gained intimate, non-public, confidential, and valuable knowledge regarding the ADA's membership, financial structure, its preferences for services/products, and business opportunities," including "a confidential opportunity to bid on the purchase of a portfolio of [roughly] 10,000 existing credit cards issued by U.S. Bank to ADA members, and to co-brand newly issued consumer and small business credit cards with the ADA." *Id.* ¶¶ 21, 23. Through the discussions about this potential credit card partnership, "Panacea obtained valuable, non-public, confidential information regarding the projected program scope and some of the ADA's desired characteristics for the program and a go-forward partner, including as it related to pricing, conversion, timeline, and technological specifications." *Id.* ¶ 26.

To prepare for the ADA's forthcoming request for proposal ("RFP"), Panacea began engaging in discussions with Tallied—a startup credit card processor—to explore a partnership for Panacea's credit card needs. *Id.* ¶¶ 27–28. As a part of these discussions, Panacea and Tallied executed an MNDA in February 2024. *Id.* ¶ 31; *see also* ECF No. 1-1.

The MNDA's stated purpose is to "protect the confidentiality of certain confidential information of [Tallied] or of [Panacea] to be disclosed under this Agreement solely for use in evaluating or pursuing a business relationship between the parties ("Permitted Use")." ECF No. 1-1 at 1. Under the MNDA, "[n]either Receiving Party will make, have made, use or sell for any purpose any product or other item using, incorporating or derived from any Confidential Information of the Disclosing Party." *Id.* ¶ 7.

The MNDA defines "Confidential Information," in relevant part, to include:

> any and all technical and non-technical information disclosed by such Party (Disclosing Party) to the other Party (Receiving Party) which may include without limitation . . . trade secrets; proprietary and confidential information; ideas; techniques; models; knowhow; processes; formulae related to the current future and proposed products and services of each of the Parties, such as information concerning research . . . development . . . financial information . . . procurement requirements, purchasing, manufacturing, customer lists, investors, employees, business and contractual relationships, business forecasts, sales and merchandising, and marketing plans . . . [and] all other information that the Receiving Party knew, or reasonably should have known, was the Confidential Information of the Disclosing Party.

*Id.* ¶ 1.

2

"After execution of the MNDA, Tallied and Panacea began a series of confidential discussions on collaborating to create a branded commercial credit card program offering for Panacea customers, including the ADA." ECF No. 1 ¶ 38. At the time the MNDA was executed, "Tallied had approximately two hundred consumer credit cards for which it served as processor, and no business card programs" and, according to Panacea, "lacked the knowledge, personnel, expertise, and contacts to bid on or scale a large credit card portfolio such as the ADA program on its own." *Id.* ¶¶ 42–43.

Between March and May of 2024, Panacea shared the following Confidential Information with Tallied in anticipation of a collaboration on the ADA credit card program: "(i) that the ADA and its existing credit card partner were confidentially contemplating a divestiture of the ADA-branded credit card portfolio; (ii) the anticipated timing of the RFP process; (iii) proposals concerning the ADA's credit card program construct, rewards structure, acquisition strategy, and partnership drivers; and (iv) Panacea's anticipated pricing and cost of funding in response to the RFP." *Id.* ¶ 45. In May 2024, Panacea informed Tallied that it "was examining other credit card processing partners but had narrowed its proposed processing partner down to Tallied and one other option." *Id.* ¶ 46. Later that month, Panacea "provided further, confidential, and detailed feedback on Tallied's pricing model, including as to the economic model on interchange fees that would be required to share with the ADA for its existing credit card portfolio." *Id.* ¶ 47. After an ADA consultant involved with the credit card program indicated that the ADA was unlikely to select a "nascent and unproven processing platform like Tallied," Panacea "informed Tallied in early June of 2024 that it was going to continue vetting processors, including seeking a more experienced processor to partner with for the ADA program." *Id.* ¶¶ 57–58.

On June 14, 2024, the ADA issued its formal RFP for a co-branded consumer and small business card program, including an opportunity to purchase the ADA's existing portfolio of cards from U.S. Bank. *Id.* ¶¶ 59–60. "On information and belief, the confidential RFP was provided to a small number of potential bidders. Panacea received the confidential RFP pursuant to a previously executed non-disclosure agreement with the ADA, and the ADA stated that the RFP itself was to be treated as confidential." *Id.* ¶ 61. "On July 29, 2024, Panacea submitted its

3

1   response to the RFP and received feedback from the ADA indicating that it was the lowest

2   bidder." *Id.* ¶ 64.  Panacea then discovered that Tallied submitted its own proposal to the ADA on

3   July 19, 2024, despite representing to Panacea that it considered Panacea to be its partner. *Id.*

4   ¶ 65.  Two months later, "the ADA repeatedly asked Panacea if it could aggressively bid on

5   pricing and interchange fees because there was now an 'anonymous' low bidder." *Id.* ¶ 73.  Based

6   on those comments, Panacea believes "Tallied used Confidential Information Panacea shared with

7   it about its own proposed pricing to undercut and undermine Panacea's ability to win the RFP"

8   and that this allowed Tallied to ultimately win the RFP as the lowest bidder—meaning it offered

9   "the highest percentage revenue share on interchange or transaction fees associated with each

10  credit card transaction that is processed using an ADA branded credit card" *Id.* ¶¶ 74–76, 78.

11  "Tallied used the pricing information it obtained from Panacea to undercut Panacea even though

12  Tallied, until receiving information from Panacea, did not even include a revenue share with the

13  ADA in a rudimentary pricing model it shared with Panacea." *Id.* ¶ 77.

14          On February 21, 2025, Panacea informed Tallied that Panacea had discovered Tallied's

15  wrongful actions and that "unless the matter could be amicably resolved, Panacea would have no

16  choice but to file suit." *Id.* ¶ 79.  Tallied responded by denying any wrongdoing and terminating

17  the MNDA.  *Id.*

18          On April 9, 2025, Panacea filed this lawsuit asserting claims for: (1) breach of contract; (2)

19  unjust enrichment; (3) violation of the Delaware Uniform Trade Secrets Act ("DUTSA"); (4)

20  common law misappropriation/conversion of confidential information; (5) tortious interference

21  with prospective business relationships; and (6) unfair competition.

22  **II.     JURISDICTION**

23          Panacea alleges that this Court has jurisdiction under 28 U.S.C. § 1332(a)(1).

24  **III.    LEGAL STANDARD**

25          A complaint must contain "a short and plain statement of the claim showing that the

26  pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  "Dismissal under Rule 12(b)(6) is

27  appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support

28  a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th

4

1    Cir. 2008).  A complaint need not contain detailed factual allegations, but facts pleaded by a

2    plaintiff "must be enough to raise a right to relief above the speculative level."  *Bell Atl. Corp. v.*

3    *Twombly*, 550 U.S. 544, 555 (2007).  "To survive a motion to dismiss, a complaint must contain

4    sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."

5    *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).  "A

6    claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

7    the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  The Court

8    must "accept all factual allegations in the complaint as true and construe the pleadings in the light

9    most favorable to the nonmoving party."  *Knievel*, 393 F.3d at 1072.  However, the Court is not

10   "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact,

11   or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008)

12   (internal quotation marks and citation omitted).

## IV.     DISCUSSION

### A.      DUTSA Claim

To state a claim for trade secret misappropriation under the DUTSA, a plaintiff must show that (1) a trade secret exists; (2) the trade secret was acquired by the defendant from the plaintiff; (3) the acquisition was pursuant to an express or implied understanding that the secrecy of the matter would be respected; and (4) the defendant has improperly used or disclosed the secret information to the injury of the plaintiff.  *See Accenture Glob. Servs. GMBH v. Guidewire Software Inc.*, 581 F. Supp. 2d 654, 662 (D. Del. 2008) (citing *Savor, Inc. v. FMR Corp.*, No. Civ. A. 10–249, 2004 WL 1965869, *5 (Del. Super. July 15, 2004)).

Tallied primarily contests the first and fourth elements—arguing that Panacea "fails to (1) identify the specific material alleged to constitute trade secrets, and (2) allege that Tallied misappropriated or used its trade secrets in connection with the ADA RFP."  ECF No. 28 at 11.

#### 1.      Existence of Trade Secret

DUTSA defines a "trade secret" as "information" that:

> a. derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from

5

        its disclosure or use; and

        b. is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

6 Del. C. § 2001(4).

    In other words, to be considered a trade secret, information must: (1) not be generally known or readily ascertainable; (2) derive independent economic value from not being generally known or readily ascertainable; and (3) be subject to reasonable efforts to maintain its secrecy. *See Brightstar Corp. v. PCS Wireless, LLC*, No. CVN18C10250PRWCCLD, 2019 WL 3714917, at *4 (Del. Super. Ct. Aug. 7, 2019).

    Panacea alleges that it disclosed confidential, protectable trade secret information to Tallied, including "proprietary information concerning interchange fees and cost of funding; knowledge of the ADA's preferences on a credit-card portfolio construct's features as to account integration, credit lines, rewards structure, conversion experience, acquisition strategy and partnership drivers; and timing and knowledge of the ADA's anticipated RFP process." ECF No. 29 at 20 (citing ECF No. 1 ¶¶ 40-56, 63-67, 73-77). Tallied argues that Panacea's alleged trade secrets—knowledge of the ADA's membership and preferences; knowledge of the ADA RFP; and feedback Panacea provided to Tallied about pricing and revenue share—are described with general catchall categories and lack the specificity to allow Tallied to determine whether Panacea possessed a trade secret rather than non-protectible ideas of concepts. ECF No. 28 at 12. After reviewing the parties' cited authorities, the Court finds that Panacea has alleged sufficient factual detail to plausibly state, at the pleading stage, the existence of trade secrets regarding the confidential information it shared with Tallied.

    Unlike cases where the plaintiff "has set out its purported trade secrets in broad, categorical terms, more descriptive of the types of information that generally *may* qualify as protectable trade secrets," *Vendavo, Inc. v. Price f(x) AG*, No. 17-CV-06930-RS, 2018 WL 1456697, at *4 (N.D. Cal. Mar. 23, 2018), Panacea has specifically described the context, timing, import, and type of information that it shared with Tallied and why that information was secret and valuable to draw clear boundaries as to what trade secrets it alleges.

    First, as to knowledge about the ADA's preferences and knowledge of the upcoming ADA

6

1   RFP, Panacea alleges that it made deliberate, extensive efforts to gain that information through
2   developing a close relationship with the ADA.  Panacea alleges that it was founded by doctors to
3   provide tailored banking, capital, and financing solutions to medical providers.  ECF No. 1 ¶¶ 15–
4   16.  Its business strategy was specifically to gain a competitive edge by "develop[ing] strong
5   relationships and enter[ing] into affinity partnerships with numerous medical trade associations
6   including," with the ADA in as early as January 2024.  *Id.* ¶ 18.  And its partnership agreement
7   with the ADA "appoint[ed] Panacea as the exclusive financial services company to establish and
8   maintain an affinity program for ADA members for various financial services products and
9   services," allowing Panacea to gain exclusive information about the ADA's membership,
10  structure, preferences, and upcoming credit-card issuance opportunity.  *Id.* ¶¶ 19, 21, 23.  Through
11  the discussions about this potential credit card partnership, "Panacea obtained valuable, non-
12  public, confidential information regarding the projected program scope and some of the ADA's
13  desired characteristics for the program and a go-forward partner, including as it related to pricing,
14  conversion, timeline, and technological specifications."  *Id.* ¶ 26.
15      Panacea has thus alleged the type of institutional knowledge on customer preferences and
16  business opportunities—developed through substantial effort and trusted access—that courts have
17  routinely recognized as trade secrets at the motion to dismiss stage.  *See Navigation Holdings,*
18  *LLC v. Molavi*, 445 F. Supp. 3d 69, 77 (N.D. Cal. 2020) (finding that the plaintiffs adequately
19  described their trade secrets in compiling price information about proven clients that they gathered
20  over the history of their operations spanning years and many hours of research); *Xsolla (USA),*
21  *Inc. v. Aghanim Inc.*, No. 2:24-CV-02116-ODW (AGRX), 2024 WL 4139615, at *7 (C.D. Cal.
22  Sept. 10, 2024) (finding that the plaintiff sufficiently alleged customer information trade secrets
23  because its complaint described compiling information about established customers, including
24  details about the customer's products and how they used the plaintiff's offerings, that the plaintiff
25  took years to develop).  And contrary to Tallied's argument that Panacea does not "attempt to
26  explain how this unspecified information about the ADA derives value from not being generally
27  known, especially given the extensive industry expertise Tallied already had," ECF No. 28 at 13,
28  Panacea has alleged that its success in the competitive bidding process on the ADA RFP depended

7

1    on its unique knowledge of the ADA being kept secret and that Tallied in fact *lacked* expertise in
2    the space as a "nascent and unproven processing platform." *See* ECF No. 1 ¶¶ 42–43, 57–58.
3           Similarly, Panacea has alleged that it disclosed trade secrets regarding its proprietary
4    pricing and financial models shared with Tallied under their MNDA. Panacea specifically alleges
5    that it shared with Tallied between March and May 2024: "proposals concerning the ADA's credit
6    card program construct, rewards structure, acquisition strategy, and partnership drivers" and
7    "Panacea's anticipated pricing and cost of funding in response to the RFP." ECF No. 1 ¶ 45. It
8    further contends that in May 2024, Panacea "provided further, confidential, and detailed feedback
9    on Tallied's pricing model, including as to the economic model on interchange fees that would be
10   required to share with the ADA for its existing credit card portfolio." *Id.* ¶ 47. Panacea thus does
11   not allege a vague claim of "pricing information" in the abstract, but a targeted, customized
12   pricing scheme it developed over a year in close collaboration with the ADA. *Xsolla (USA), Inc.*,
13   2024 WL 4139615, at *7 (finding that the plaintiff sufficiently alleged trade secrets relating to
14   pricing because it alleged spending "countless hours developing confidential and proprietary
15   pricing schemes tailored to the needs of the individual video game developers and publishers
16   . . . which took many years and significant effort and testing to develop").

17           **2.     Misappropriation**

18           Tallied primarily argues that Panacea has not plausibly alleged that Tallied
19   misappropriated any of the purported trade secrets and relies only on speculative circumstantial
20   evidence. Tallied cites cases for the proposition that allegations of similarity or rapid development
21   of a competing product or bid—without more—do not plausibly state a claim for misappropriation
22   of underlying trade secrets to create that product or bid. *See* ECF No. 28 at 17–19 (citing
23   *Accenture Glob. Servs. GMBH v. Guidewire Software Inc.*, 581 F. Supp. 2d 654 (D. Del. 2008);
24   *GMH Capital Partners v. Fitts*, 2025 WL 950674 (S.D.N.Y. Mar. 28, 2025); and *Xsolla (USA),*
25   *Inc.*, 2024 WL 4139615). While the Court agrees with the general proposition described in these
26   cases, it finds that under the facts as alleged in the complaint, Panacea has plausibly alleged
27   misappropriation.
28           In its complaint, Panacea alleges that (1) Tallied had been representing to Panacea that it

8

1  still considered Panacea to be its partner in the ADA RFP process while surreptitiously preparing
2  and submitting its own proposal; (2) Tallied was able to win the RFP as the bidder offering the
3  highest percentage revenue share to the ADA, despite not even including a revenue share in the
4  "rudimentary pricing model it shared with Panacea" during their collaborative efforts; and (3)
5  Tallied generally "lacked the knowledge, personnel, expertise, and contacts to bid on or scale a
6  large credit card portfolio" because it had no business card programs.  ECF No. 1 ¶¶ 42–43, 65,
7  74–78.  Taking these circumstances together, Panacea alleges that Tallied must have used the
8  pricing information it obtained from Panacea to undercut Panacea in the bid process.  *Id.* ¶ 77.

   Panacea has thus alleged the nature of the information Tallied misappropriated and how it
did so (incorporating Panacea's feedback on revenue share and information about the ADA's
preferences into its bid proposal), as well as why circumstances show it was likely that Tallied
misappropriated this information—i.e., Tallied's nondisclosure of its own bid submission and its
sudden ability to offer the more competitive revenue share after gaining this exact expertise from
Panacea's confidential feedback.  These allegations sufficiently satisfy the misappropriation
element of Panacea's DUTSA claim, particularly at this stage in a trade-secrets case, where "the
exact means of knowing what was used is nearly impossible for Plaintiff to know without
discovery."  *See Applied Biological Lab'ys, Inc. v. Diomics Corp.*, No. 3:20-CV-2500-AJB-LL,
2021 WL 4060531, at *5 (S.D. Cal. Sept. 7, 2021); *see also Yeiser Rsch. & Dev. LLC v. Teknor
Apex Co.*, 281 F. Supp. 3d 1021, 1033, 1043–44 (S.D. Cal. 2017) (finding that plaintiff adequately
pled misappropriation by alleging that the defendant had no prior experience in the industry,
expressed curiosity in the product being developed by the plaintiff, and subsequently developed a
similar product); *Eastman Chem. Co. v. AlphaPet Inc.*, No. CIV.A. 09-971-LPS, 2011 WL
5402767, at *9 (D. Del. Nov. 4, 2011), *report and recommendation adopted*, No. CIV.A. 09-971-
LPS, 2011 WL 6148637 (D. Del. Dec. 9, 2011) (finding misappropriation to be adequately pled
where the plaintiff in the case provided a description of how the defendants gained access to the
trade secrets and how the trade secrets were used to develop a competing product).

   Furthermore, Tallied's assertion that it could have plausibly learned about the RFP on its
own is beside the point.  *See* ECF No. 28 at 16.  Setting aside the fact that the Court must draw all

9

1  inferences in Panacea's favor, the value of the information about the ADA RFP came from having
2  insider knowledge about what it would entail and what the ADA wanted *before* the bid process
3  officially began, as this allowed those with that knowledge to tailor and prepare their proposals
4  accordingly. Tallied could thus very well have misappropriated the trade secrets at issue even if it
5  did eventually learn about the ADA RFP on its own.

6  Accordingly, the Court denies Tallied's motion to dismiss Panacea's DUTSA claim.

### B.  DUTSA Preemption

Tallied argues that Panacea's unjust enrichment, unfair competition, tortious interference, and common law misappropriation claims are preempted by DUTSA.

Panacea responds by contending that: (1) dismissing these claims on preemption grounds at the motion to dismiss stage would be premature; (2) it can make its common law claims without proving a trade secret claim; (3) and it is allowed to plead arguments in the alternative under Rule 8. ECF No. 29 at 17–20.

DUTSA's preemption provision states that the Act "displaces conflicting tort, restitutionary and other law of this State providing civil remedies for misappropriation of a trade secret." 6 Del. C. § 2007(a). Courts have interpreted this language to mean that DUTSA preempts claims that are "grounded in the same facts which purportedly support the misappropriation of trade secrets claims." *Ethypharm S.A. France v. Bentley Pharms., Inc.,* 388 F. Supp. 2d 426, 433 (D. Del. 2005) (quoting *Savor, Inc. v. FMR Corp.,* 2001 WL 541484, at *4 (Del. Super. Apr. 24, 2001)). A common law claim is "grounded in the same facts" as a trade secret claim if "the same facts are used to establish all the elements of both claims." *Accenture Global Servs. GMBH v. Guidewire Software Inc.,* 631 F. Supp. 2d 504, 508 (D. Del. 2009) (citing *Ethypharm,* 388 F. Supp. 2d at 434–35). In other words, "if the success of the common law claim does not depend on the success of the trade secrets claim, that is, if a plaintiff need not prove all the facts underlying the trade secrets claim in order to prove the common law claim, then the common law claim is not 'grounded in the same facts' and is not preempted." *Id.*

As a preliminary matter, the Court recognizes that while the question of DUTSA preemption is often fact-bound, courts applying Delaware law have nonetheless routinely

10

addressed it at the motion to dismiss stage. *See, e.g.*, *Battaglia Mgmt., Inc. v. Abramowicz*, No. 23-cv-615-GBW, 2024 WL 3183063, at *5 (D. Del. June 26, 2024) (collecting cases); *but see Accenture Glob. Servs. GMBH v. Guidewire Software Inc.*, 631 F. Supp. 2d 504, 508 (D. Del. 2009) ("Whether a party has, in fact, 'grounded' a common law claim 'in the same facts' as its trade secret claim often cannot be determined at the motion to dismiss stage."). Relatedly, Rule 8's general allowance of alternative pleading does not apply in the DUTSA preemption context. *See Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 898 (Del. 2002) (rejecting petitioner's argument that it should have been allowed to maintain its alternative common law claims in the event that its statutory trade secret claims were dismissed given DUTSA's express objective to displace common law claims based on misappropriation).

Turning to Panacea's claims, the Court finds that DUTSA preempts its state law claims for unjust enrichment and common law misappropriation. Tallied cites several cases in which courts have found that DUTSA preempts those claims under similar circumstances. *See* ECF No. 28 at 20 (citing *250ok, Inc. v. Message Sys., Inc.*, 2021 WL 225874, at *1 (Del. Ch. Jan. 22, 2021); *Alarm.com Holdings, Inc. v. ABS Cap. Partners, Inc.*, 2018 WL 3006118, at *10 (Del. Ch. June 15, 2018), *aff'd*, 204 A.3d 113 (Del. 2019); *Cal. Safe Soil, LLC v. KDC Agribusiness, LLC*, 2025 WL 98479, at *24 (Del. Ch. Jan. 10, 2025)). While Panacea argues that these cases are distinguishable, it merely recites the preemption standard that "the common law causes of action alleged by Panacea are not 'grounded in the same facts' as the DUTSA claim" without explaining *how* that is true or what separate facts its common law causes of action are grounded in. *See* ECF No. 29 at 19.

Indeed, there is little daylight in Panacea's complaint between its DUTSA trade secret claim and its claims of unjust enrichment and common law misappropriation. For unjust enrichment, Panacea alleges that "Tallied has benefited and been unjustly enriched by virtue of its wrongful and unlawful conduct, including its use of Panacea's Confidential Information to (1) obtain the ADA RFP and (2) undermine and undercut Panacea's ability to win the RFP." ECF No. 1 ¶ 86. In other words, Panacea alleges that Tallied has unjustly benefitted from misappropriating Panacea's confidential information—the most pertinent of which involves the trade secrets alleged

here. *See id.* ¶¶ 91 (alleging that Tallied is liable for violating DUTSA by "unlawfully converting and using Panacea's Confidential Information, . . . for its own purposes and with utter disregard for the effect of such disclosure on Panacea"). The same is true for Panacea's common law misappropriation and/or conversion of confidential information claim—as the complaint repeats the exact language as for the DUTSA claim. *Compare id.* ¶¶ 90–91 *with id.* ¶¶ 96–97; *see also Alarm.com Holdings, Inc.*, 2018 WL 3006118, at *11 ("Alarm has asserted a claim for common law misappropriation of confidential information, which to my mind is the clearest possible candidate for preemption under DUTSA.").

      The Court, however, declines to find that Panacea's claims for unfair competition and tortious interference with prospective business relationships are preempted at this stage. Unlike with the claims discussed above, Panacea has stated sufficient independent facts supporting its claims of unfair competition and tortious interference. Under Delaware law, "[b]oth claims require a wrongful interference with the plaintiff's expectancy in a business relationship that had a reasonable probability of being consummated." *You Map, Inc. v. Snap Inc.*, No. CV 20-00162-CFC, 2021 WL 106498, at *8 (D. Del. Jan. 12, 2021), *report and recommendation adopted*, No. CV 20-162-CFC, 2021 WL 327388 (D. Del. Feb. 1, 2021). The complaint alleges that Tallied feigned interest in entering into a partnership with Panacea to induce Panacea to disclose its confidential information about the ADA and the ADA's RFP and ultimately used "dishonest, unfair, and improper means to interfere with [Panacea's] prospective business relationship" with the ADA. *See* ECF No. 1 ¶¶ 103–04, 108. Those allegations are separate enough from the alleged misappropriation for these two claims to survive preemption at this stage. *See Ethypharm S.A. France*, 388 F. Supp. 2d at 435 (declining to find that DUTSA preempted a tortious interference with prospective business relationships because even "if the theft of the information does not rise to the level of misappropriation of trade secrets," the intentional acts of using sensitive information to knowingly interfere with existing business relationships could be sufficient to satisfy the elements of the intentional interference claim).

      Accordingly, the Court grants Tallied's motion to dismiss Panacea's claims for unjust enrichment and common law misappropriation/conversion of confidential information, and it

12

denies the motion to dismiss the claims for unfair competition and tortious interference with prospective business relationships.

### C. Breach of Contract

Tallied largely repeats the arguments it made regarding the DUTSA claim for why Panacea has also failed to state a claim for breach of contract.

First, Tallied argues that the information about the ADA RFP was not subject to the MNDA because "according to Panacea's own allegations, for Tallied to have participated in the ADA RFP, Tallied must have received the RFP independently"—thus making the information about the RFP no longer confidential under the terms of the MNDA. ECF No. 28 at 22. As the Court explained above, even considering Tallied's disputes of fact, Tallied's argument only goes to whether knowledge of the actual RFP and scope of the RFP are confidential. The fact that Tallied may have ultimately learned about the ADA RFP on its own—*after* the ADA actually issued its RFP—does not affect whether information shared regarding Panacea's pricing strategy or ADA's private preferences is confidential.

Second, Tallied argues that Panacea has not provided sufficient factual detail to support its assertion that Tallied used Panacea's information for its RFP bid and that Panacea's claim that Tallied used any such information is entirely speculative. ECF No. 28 at 22. For the same reasons discussed above regarding misappropriation, the Court rejects Tallied's argument and finds that Panacea has adequately alleged that Tallied used the confidential information disclosed under the MNDA to win the ADA RFP.

Accordingly, the Court denies Tallied's motion to dismiss Panacea's claim for breach of contract.

## CONCLUSION

For the foregoing reasons, the Court grants Tallied's motion to dismiss in part and denies it in part. Panacea's claims for unjust enrichment and common law misappropriation/conversion of confidential information are denied with leave to amend. The Court denies the remainder of Tallied's motion.

///

Within 21 days from this order, Panacea may file an amended complaint solely to cure the deficiencies identified in this order.  The case management conference scheduled for October 7, 2025 is continued to December 2, 2025 at 2:00 p.m.

**IT IS SO ORDERED.**

Dated:  September 24, 2025



JON S. TIGAR
United States District Judge